**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
DAVID HOSANNAH,

                    Plaintiff,                                    **REPORT AND**
                                                                 **RECOMMENDATION**

                                                                 15-CV-03773 (GRB) (LGD)

          v.


OFFICER AMEED SAEED and NASSAU
COUNTY CORRECTIONAL CENTER
SHERIFF DEPARTMENT

                    Defendants.
--------------------------------------------------------X

**LEE G. DUNST**, Magistrate Judge:

          *Pro se* plaintiff David Hosannah ("Plaintiff"), an inmate currently in custody of the New York

State Department Corrections and Community Supervision, commenced this action pursuant to 42

U.S.C. Section 1983 on June 18, 2015 alleging that he suffered verbal threats, sexual harassment, and

sexual abuse while incarcerated at the Nassau County Correctional Center ("NCCC") in 2014 and

2015 in violation of his rights under the First, Fifth, Eighth, Ninth, and Fourteenth Amendments.  *See*

*generally* Complaint, Electronic Case File Docket Number ("ECF No.") 1 ("Complaint" or

"Compl.").[1]  Presently before the Court, pursuant to the January 19, 2022 referral from the Honorable

Gary R. Brown for a Report And Recommendation, is the motion for summary judgment under

Federal Rule of Civil Procedure 56 by defendants Officer Ameed Saeed ("Saeed") and Nassau County

Correctional Center Sheriff's Department ("Sherriff's Department" and together with Saeed,

"Defendants") seeking dismissal of the Complaint with prejudice.  *See* ECF No. 69.  As set forth

below, the undersigned respectfully recommends that the Court GRANT IN PART and DENY IN

---

[1] Unless otherwise noted, ECF No. citations are to this action, *Hosannah v. Saeed et al*, No. 15-CV-03773 ("*Hosannah I*").  ECF citation will reflect when they refer to the docket of the consolidated case, *Hosannah v. Nassau County Sheriff Department Division of Correction et al.*, No. 15-cv-05413 ("*Hosannah II*").  For ease of reference, the Court's citations to Plaintiff's filings refer to the ECF page numbering stamped at the top of each page therein.  *See Parker v. Fantasia*, 425 F. Supp. 3d 171, 179 n.6 (S.D.N.Y. 2019) (using this method).

PART Defendants' motion for summary judgment and that the Court DISMISS certain claims under 42 U.S.C. § 1997e(c) and 28 U.S.C. § 1915(e)(2)(B)(ii).

## I.   FACTUAL BACKGROUND

The facts, as recited below, are taken from the Complaint, Defendants' Local Civil Rule 56.1 Statement at ECF No. 69-1 ("Def. 56.1 Statement"),[2] Plaintiff's opposition to the motion for summary judgment at ECF No. 72, and admissible evidence submitted by the parties.

### A.   Admission to the NCCC

Plaintiff was arrested on September 13, 2013 and admitted to the NCCC on September 14, 2013.  *See* Def. 56.1 Statement ¶ 1; ECF No. 70-5 ("Plaintiff's Dep. Tr.") at 14:7-16.  The NCCC is "the County jail facility which is staffed by members of the Nassau County Sheriff's Department, Division of Corrections."  Def. 56.1 Statement ¶ 2.

### B.   Allegations Concerning Saeed

#### 1.   The First Grievance

On January 30, 2014, Saeed "harassed" Plaintiff by stating Plaintiff looked "big and strong" and "gentley [sic] squeezing" Plaintiff's shoulder.  *See* Compl. at 7.  The next day, on January 31, 2014, Plaintiff filed Grievance Form #014-02-14 (the "First Grievance") with the NCCC, which reported the interaction with Saeed and requested "a full investigation . . . ."  *Id.*  On February 7, 2014, the Grievance Coordinator filled in the "Decision of the Grievance Coordinator" section of the First

---

[2] The Local Civil Rules require motions for summary judgment to attach "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civil Rule 56.1(a).  The Local Civil Rules also require the nonmovant, here the Plaintiff, to file a statement with "correspondingly numbered paragraph[s] responding to each numbered paragraph in the statement of the moving party . . . ."  Local Civil Rule 56.1(b).  Plaintiff failed to file a statement under Local Civil Rule 56.1.  "While *pro se* litigants are . . . not excused from meeting the requirements of Local Rule 56.1 . . . where a *pro se* plaintiff fails to submit a proper Rule 56.1 Statement in opposition to a summary judgment motion, the Court retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions."  *Wiggins v. Griffin*, No. 18-CV-07559, 2021 WL 706720, at *1 n.1 (S.D.N.Y. Feb. 22, 2021) (internal quotations omitted).  While Plaintiff's opposition to Defendants' motion does not specifically address Defendants' Rule 56.1 Statement, the Court exercises its discretion to consider Plaintiff's submission as opposition to Defendants' Rule 56.1 Statement.  *See id.; Brown v. Phipps*, No. 19-CV-04356, 2021 WL 3604664, at *1 n.3 (S.D.N.Y. Aug. 12, 2021).

Grievance by noting that the grievance was "[a]ccepted" because "[a]ny information received alleging staff misconduct must be forwarded to the Sheriff's Bureau of Investigation for investigation." *Id*. On February 10, 2014, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form but did not check whether he accepted or appealed the Grievance Coordinator's decision. *See id*.

### 2.    The Second Grievance And First Disciplinary Form

On March 28, 2014, Saeed learned that an investigation found him "not to be guilty" of the conduct alleged in the First Grievance, and he then filled out Disciplinary Form 8771 (the "First Disciplinary Form") charging Plaintiff with filing a false report. *See id.* at 13.[3]  That same day, Saeed threatened to lock Plaintiff in his unit unless he signed the First Disciplinary Form. *See id*. at 9.  On April 3, 2014, Saeed confirmed to Plaintiff that he "spoke to internal affairs" about the First Grievance.  Compl. at 4.

 Later on April 3, 2014, Plaintiff filed Grievance Form #033-04-14 (the "Second Grievance") with the NCCC, which (1) reported the March 28, 2014 interaction with Saeed, (2) characterized that interaction as "retaliating against [an] inmate for grieving an officer for his misconduct" because it took place after "internal affairs spoke to" Saeed about the First Grievance, (3) stated "I refused the law library and was given [the First Disciplinary Form] from Officer Saeed," and (4) requested that the matter be investigated and that Saeed undergo "a [psych]ological examination"  Compl. at 9.  On April 9, 2014, the Grievance Coordinator filled in the "Decision of the Grievance Coordinator"

---

[3] The copy of the First Disciplinary Form attached to the Complaint is an illegible scan.  The First Disciplinary Form's charge, however, was read into the record during Plaintiff's deposition:

> On January 30th of 2014, Inmate David Hosannah . . . filed [the First Grievance] against me that subsequently went to the Internal Affairs. Today I was advised by Internal Affairs that I was not found to be guilty of any of the false allegations made by Inmate Hosannah. Further corroboration of the above stated can be confirmed by the Internal Affairs Unit. Based on the inmate's action, he filed a false report, a violation noted in the inmate handbook.

Plaintiff's Dep. Tr. at 111:23-112:20.

section of the form by checking that the grievance was "[a]ccepted" and noting that "[a] copy of this grievance was forwarded to the facility's investigative unit, Internal Affairs (IA)."  *Id*.  On April 14, 2014, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form but did not check whether he accepted or appealed the Grievance Coordinator's decision.  *See id*.  The Second Grievance contains a handwritten "witness" note that Plaintiff "refused to check" whether he accepted or appealed the decision of the Grievance Coordinator.  *Id*.

3.    The Third Grievance

On or before April 18, 2014, an unidentified Corporal gave Plaintiff a copy of the First Disciplinary Form.  *See* Plaintiff's Dep. Tr. at 112:24-113:14.  On April 18, 2014, Saeed went to Plaintiff and threatened to "fuck [Plaintiff] up" if Plaintiff failed to give that copy of the Disciplinary Report to Saeed.[4]  Compl. at 11; *see* Compl. at 4.  That same day, Plaintiff filed Follow Up Grievance Form #033-04-14 (the "Third Grievance") with the NCCC, which described the April 18, 2014 interaction with Saeed and requested that the NCCC "investigate this problem."[5]  Compl. at 11.

4.    The Fourth Grievance

On July 1, 2015, Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff.  *Hosannah II*, ECF No. 1 at 10.  On July 2, 2015, Plaintiff filed Grievance Form #023-07-16 (the "Fourth Grievance", and together with the First Grievance, Second Grievance, and Third Grievance, collectively, the "Grievances") with the NCCC, which described the July 1, 2015 interaction with Saeed and requested that the NCCC "look into this ongoing problem."  *Id*.  On July 10, 2015, the Grievance Coordinator filled in the "Decision of the

---

[4] Plaintiff testified that, because an inmate typically receives the disciplinary form at the resulting hearing, Plaintiff believes Saeed was angry that Plaintiff "had gotten a copy earlier." Plaintiff Dep. Tr. at 113:19-114:9.

[5] The Second Grievance and Third Grievance share the same number: 033-14-14. *Compare* Compl. at 9 *with id*. at 11. Defendants describe the Third Grievance as a "follow up" to the Second Grievance. Def. Mem. at 5. Consistent with that characterization, handwriting that apparently states "F. Up" precedes the grievance number on the Third Grievance. *See* Compl. at 11.

4

Grievance Coordinator" section of the form by checking that the grievance was "[a]ccepted" and noting that "[t]his office has investigated the incident . . . and was unable to substantiate" the allegations. *Id*. On July 14, 2015, Plaintiff signed his name in the "Acceptance/Appeal of Grievance Coordinator's decision" section of the form and checked that he "read and accepted the Grievance Coordinator's decision." *Id*.

### 5.    August 12, 2015 Incident And Second Disciplinary Form

On August 12, 2015, Plaintiff met with internal affairs "after almost 2 years of constantly writing grievance[s] and complaint[s] to every higher personnel at [the NCCC]." ECF No. 72 at 11. Saeed stopped Plaintiff's escort back from that meeting and told Plaintiff to put his hands up against the wall adjacent to the dorm entrance. *See id*. As Plaintiff complied with that directive, the officer already escorting Plaintiff asked "What did [Plaintiff] do?" *Id*. Saeed ignored that question and instead told Plaintiff "don't fucking move." *Id*. Plaintiff began to state that he did not move and was complying, but "before [Plaintiff] even finish[ed his] sentence" Saeed said "shut the fuck up and face the fucking wall." *Id*. at 12. Plaintiff reports that "Saeed then proceeded to pat or frisk me as he reach my lower back area he then squeeze my butt, then from behind he reach between my legs and grab my private part slowly holding it for a few seconds. Then slowly bring his hands back between my legs very slowly holding and squeezing my butt [again]." *Id*.; *see Hosannah II*, ECF No. 1 at 4, 20 (similar). During that search, the officer who was already escorting Plaintiff asked Saeed "what['s] the problem?," asked Saeed "what did he do?," and confirmed to Saeed "we already search[ed] him downstairs." ECF No. 72 at 12; *see Hosannah II*, ECF No. 1 at 4, 20 (similar). Instead of responding to that other officer, Saeed threatened to go to Plaintiff's unit if Plaintiff said "anything" about the encounter. ECF No. 72 at 12; *Hosannah II*, ECF No. 1 at 4, 20.

Later on August 12, 2015, Plaintiff wrote a letter to the New York State Inspector General and the New York State Commission of Correction Internal Affairs Unit to report that day's incident with

Saeed, and Saeed gave Plaintiff Disciplinary Form #99560 ("Second Disciplinary Form").  *See* ECF No. 72 at 11-12; *Hosannah II*, ECF No. 1 at 4, 20.  The copy of the Second Disciplinary Form provided to the Court is illegible, and neither Plaintiff nor Defense counsel were able to read the Second Disciplinary Form at Plaintiff's deposition.  *Hosannah II*, ECF No. 1 at 13; Plaintiff's Dep. Tr. 125:11-126:25.  Notably, Defendants' summary judgment filings are silent on the August 12, 2015 incident.

### C.    Allegations Concerning Other Corrections Personnel

Plaintiff alleges that Sergeant Morrone ("Morrone"), Sergeant Krueger ("Krueger"), and Captain Rogers ("Rogers") each "assist[ed] [Saeed] in violating [Plaintiff's] civil rights."  *See Hosannah II*, ECF No. 1 at 5.  To that end, Plaintiff alleges that (1) an unspecified person "lock[ed him] in" at an unspecified time after Plaintiff at some point spoke to Morrone about the First Grievance, and (2) Plaintiff received a memo dated August 17, 2015, which was signed by Krueger on behalf of Rogers, that imposed a 30-day law library restriction as a result of the Second Disciplinary Form. *See id.* at 4, 14.

### D.    Impact Of These Experiences

As a result of the foregoing experiences, Plaintiff reportedly suffered from "insomnia, nightmares, and an overall fear of Officer Saeed" as well as "psychological injury, psychological trauma, and depression."  ECF No. 72 at 3.

### E.    Plaintiff's Conviction And Transfer From the NCCC

In connection with his September 13, 2013 arrest, Plaintiff was convicted in October 2015 of a robbery offense, sentenced to 20 years, and transferred from the NCCC to the New York State Department of Corrections and Community Services on October 11, 2016.  *See* Def. 56.1 Statement ¶ 3; Plaintiff's Dep. Tr. at 12:14-14:16.

## II.    PROCEDURAL HISTORY

On June 18, 2015, Plaintiff commenced this action (*Hosannah I*) by filing the Complaint, which asserts claims under 42 U.S.C. Section 1983 that Defendants violated Plaintiff's rights under the First, Fifth, Eighth, Ninth, and Fourteenth Amendments.  *See generally* Compl.  On August 21, 2015, then-presiding District Judge Joseph F. Bianco granted Plaintiff's motion to proceed *in forma pauperis* in *Hosannah I*.  *See* ECF No. 9.  On September 10, 2015, Plaintiff commenced a second action (*Hosannah II*).  *See Hosannah II*, ECF No. 1.  On September 19, 2015, Defendants answered the Complaint in *Hosannah I*.  *See* ECF No. 12.  On November 18, 2015, then-District Judge Bianco issued an Order that (1) granted Plaintiff's motion to proceed *in forma pauperis* in *Hosannah II* and (2) consolidated the *Hosannah II* complaint into *Hosannah I* and closed the docket for *Hosannah II* because the cases "are largely duplicative."  ECF No. 17 at 2-4.

On January 19, 2022, District Judge Gary R. Brown (to whom the case was reassigned on January 31, 2020) ordered that "any dispositive pretrial motions are referred to the assigned Magistrate Judge for a Report and Recommendation."  January 19, 2022 Order.  On April 6, 2022, Magistrate Judge Anne Y. Shields, to whom this case was then assigned, issued an order that confirmed the parties completed discovery and set a briefing schedule for the parties' anticipated summary judgment motion practice.  *See* April 6, 2022 Scheduling Order.  On June 10, 2022, this case was reassigned to the undersigned Magistrate Judge.  *See* June 10, 2022 Notice Of Reassignment. Consistent with the schedule set by the Court, Defendants filed the parties' collective motion papers on June 14, 2022.  *See* ECF Nos. 69-73.

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant[s] [are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "No genuine

dispute of material fact exists when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022) (internal quotations omitted). "The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (internal quotations omitted). With respect to issues for which the burden of proof falls on the nonmoving party, the movant can merely "point[] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Id.* (internal quotations and alterations omitted). Once the moving party carries its burden, "the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney*, 49 F.4th at 738 (internal quotations omitted). In this analysis, the Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 518 (2d Cir. 2018). Critically, "[t]he role of the district court on summary judgment is 'not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'" *McKinney*, 49 F.4th at 738 (quoting *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)).

### B.    Plaintiff's Pro Se Status

A court considering a motion for summary judgment must afford "special solicitude" to a *pro se* litigant. *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 522 (S.D.N.Y. 2015) (quoting *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988)). To that end, the Court must "liberally construe" Plaintiff's filings and "read[] such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild For The Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (quoting *Bertin v. United States*, 478 F.3d 489, 491 (2d Cir. 2007)). The duty to liberally construe those filings "is not the equivalent of a duty to re-write [them]." *Williams v. Richardson*, 425 F. Supp. 3d 190, 201 (S.D.N.Y. 2019) (internal quotations omitted). This policy is "driven by the understanding that implicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to

protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *McLeod*, 864 F.3d at 156  (quoting *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007)). Nonetheless, "pro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.'" *E.g.*, *Peavey v. A. Rosenblum, Inc.*, 793 F. Supp. 2d 590, 594 (E.D.N.Y. 2011) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)); *see Faretta v. California*, 422 U.S. 806, 834 n.46 (1975) ("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."). At bottom, construing Plaintiff's filings liberally, Plaintiff must still satisfy "the usual requirements of summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund,* 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (internal quotations omitted).

### C.    Plaintiff's Section 1983 Claims

Section 1983 provides that

> Every person who, under color of any statue, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured.

42 U.S.C. § 1983. "It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ.*, 423 F.3d 153, 159 (2d Cir. 2005); *see Moroughan v. Cnty. of Suffolk*, 514 F. Supp. 3d 479, 511 (E.D.N.Y. 2021) ("Section 1983 does not itself create substantive rights; it offers a method for vindicating federal rights elsewhere conferred." (internal quotations omitted)).

## IV.    DISCUSSION

Defendants seek summary judgment in their favor on three grounds: (1) the Prison Litigation Reform Act ("PLRA") bars this action, (2) the alleged verbal abuse "does not amount to constitutional violations" recoverable under Section 1983 and (3) the Sherriff's Department is a non-suable entity. *See* ECF No. 71 ("Def. Mem.") at 3-7. Those arguments (and other issues) are addressed below.

**A.     Plaintiff's Facially Deficient Claims**

For the reasons detailed below, the Court recommends the Court dismiss the claims against the Sheriff's Department consistent with Defendants' motion and recommends that the Court *sua sponte* dismiss the claims that rely on the Fifth, Eighth, and Ninth Amendments.  *See* Def. Mem. at 7 (arguing for dismissal of claims against the Sheriff's Department); 42 U.S.C. § 1997e(c) (requiring the Court to dismiss a Section 1983 prisoner action "on its own motion" when "the court is satisfied that the action . . . fails to state a claim upon which relief can be granted"); 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring the Court to dismiss an action proceeding *in forma pauperis* "at any time" the Court determines it "fails to state a claim on which relief may be granted").

**1.     Claims Against the Sheriff's Department**

"It is well established that Plaintiff cannot maintain claims against the Nassau County Sheriff's Department, because it is an administrative arm of the County that cannot be sued separately."  *Gazzola v. Cnty. of Nassau*, No. 16-CV-0909, 2022 WL 2274710, at *15 (E.D.N.Y. June 23, 2022) (collecting cases).  To the extent Plaintiff may have intended for the claim against the Sherriff's Department to have been asserted against the NCCC, such a claim would fail for the same reasons.  *See id.* (explaining that the NCCC is a non-suable entity); *Gleeson v. Cnty. of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (same).

At the motion to dismiss stage, some courts replace improperly named municipal administrative defendants in *pro se* complaints with the municipalities themselves (provided the latter are not already defendants) and then construe plaintiffs' claims as pursuing municipal liability.  *See, e.g., Haddock v. Nassau Cnty. Ct.*, No. 21-CV-2923, 2021 WL 5920035, at *2 (E.D.N.Y. Dec. 15, 2021).  The Court is not required to do so after the conclusion of summary judgment briefing and the close of fact discovery.  *See Barnes v. Malavi*, 412 F. Supp. 3d 140, 141 n.2 (E.D.N.Y. 2019) (granting summary judgment and dismissing claim against non-suable defendant Suffolk County

Correctional Facilities Riverhead without construing the claim against Suffolk County); *Greene v. D.O.C.*, No. 10-CV-5344, 2012 WL 694031, at *2 (S.D.N.Y. Mar. 5, 2012) (holding defendant Department of Corrections was a non-suable entity and concluding that was an "independently sufficient" basis to grant summary judgment dismissing the case). Nonetheless, after addressing the claims against Saeed, this Report And Recommendation explains why Plaintiff has not alleged a claim for municipal liability.

### 2. The Fifth Amendment Claim

"The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law." *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (internal quotations omitted). Plaintiff's "citation to the Fifth Amendment is inapposite" because Defendants are "not federal[] actors . . . ." *Bussey v. Phillips*, 419 F. Supp. 2d 569, 586 (S.D.N.Y. 2006) (citing *Dusenbery*, 534 U.S. at 167) (dismissing Section 1983 claim); *see Meisel v. Westchester Cnty.*, No. 18-CV-7202, 2020 WL 3472500, at *3 (S.D.N.Y. June 25, 2020) (concluding Fifth Amendment violations did not occur at Westchester County Jail because defendants were "state, not federal, actors").

### 3. The Eighth Amendment Claim

"[T]he Eighth Amendment provides that cruel and unusual punishments shall not be inflicted . . . [and] the Fourteenth Amendment incorporates the Cruel and Unusual Punishments Clause against the States." *Jones v. Mississippi*, __ U.S. __, 141 S. Ct. 1307, 1314 (2021) (internal quotations omitted). As noted above, Plaintiff was a pretrial detainee at all relevant times. The Eighth Amendment does not apply to pretrial detainees because they "have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotations omitted); *see Revere v. Mass.*

*Gen. Hosp.*, 463 U.S. 239, 244 (1983) (similar).  Accordingly, Plaintiff cannot maintain a claim for an

Eighth Amendment violation during the relevant time at the NCCC.  *See Martinez v. United States*,

No. 20-CV-7275, 2021 WL 4224955, at *5 n.4 (S.D.N.Y. Sept. 16, 2021) (dismissing Eighth

Amendment claim because plaintiff was a pretrial detainee during the relevant time-period); *Sanders*

*v. Simonovic,* No. 19-CV-5525, 2021 WL 707060, at *10 (S.D.N.Y. Feb. 23, 2021) (same), *appeal*

*dismissed*, No. 21-600, 2021 WL 4167369 (2d Cir. July 1, 2021);

### 4.    The Ninth Amendment Claim

The Ninth Amendment provides that "[t]he enumeration in the Constitution of certain rights,

shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX.

The Ninth Amendment "is not an independent source of constitutional rights that may be asserted in a

civil rights action." *Lloyd v. Lee*, 570 F. Supp. 2d 556, 566 (S.D.N.Y. 2008).  That is, "[t]he Ninth

Amendment cannot serve as the basis for a § 1983 claim because such a claim must be premised on

the violation of a right guaranteed by the U.S. Constitution or federal law" *Id*.; *see Meisel*, 2020 WL

3472500, at *3 ("[T]he Ninth Amendment cannot serve as the basis for a § 1983 claim."); *Diaz v. City*

*of New York*, No. 00-CV-2944, 2006 WL 3833164, at *7 (E.D.N.Y. Dec. 29, 2006) ( "[N]o

independent constitutional protection is recognized which derives from the Ninth Amendment and

which may support a § 1983 cause of action" (internal quotations omitted)).

### B.    The PLRA

Defendants argue that the PLRA's provisions requiring exhaustion of administrative remedies

in this case and the presence of physical injury bar Plaintiff's claims.  *See* Def. Mem. at 3-6.  The

Court disagrees.

### 1.    Exhaustion

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."

42 U.S.C. § 1997e.  This requirement "applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, and whether they allege excessive force or some

other wrong." [6]  *Porter v. Nussle*, 534 U.S. 516, 532, (2002).  Failure to exhaust administrative

remedies is an affirmative defense that may be resolved on a motion for summary judgment.  *See*

*Walker*, 45 F.4th at 612 (recognizing that failure to exhaust administrative remedies is an affirmative

defense); *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 178 (2d Cir. 2006) (affirming summary

judgment dismissal of prisoner's claims for failure to exhaust administrative remedies).

Critically, an inmate "must exhaust available remedies, but need not exhaust *unavailable*

ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (emphasis added); *see Hayes v. Dahlke*, 976 F.3d 259,

268 (2d Cir. 2020) ("The PLRA requires an inmate to exhaust all 'available' administrative remedies

before bringing a federal civil rights action" (quoting 42 U.S.C. § 1997e)).  Under that principle, "an

inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to

obtain 'some relief for the action complained of.'"  *Ross*, 578 U.S. at 642 (quoting *Booth v. Churner*,

532 U.S. 731, 738 (2001)).  With respect to available remedies, the "PLRA requires 'proper

exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the

agency addresses the issues on the merits).'"  *Ruggiero*, 467 F.3d at 176 (quoting *Woodford v. Ngo*,

548 U.S. 81, 90 (2006)).  In other words, "[i]t is the prison's requirements, and not the PLRA, that

define the boundaries of proper exhaustion."  *Hayes*, 976 F.3d at 268 (quoting *Jones*, 549 U.S. at

218).  The exhaustion inquiry therefore requires the Court to review the NCCC's available

"procedures and the prisoner's grievance to determine whether the prisoner has complied with those

---

[6] Congress enacted the PLRA to "address the large number of prisoner complaints filed in federal court," i.e. to "reduce the quantity and improve the quality of prisoner suits" concerning confinement.  *Walker v. Schult*, 45 F.4th 598, 611-12 (2d Cir. 2022) (first quoting *Jones v. Bock*, 549 U.S. 199, 202 (2007); and then quoting *Porter*, 534 U.S. at 524).  The PLRA was also intended "to afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case."  *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (internal quotations and alterations omitted).

procedures." *Angulo v. Nassau County*, 89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009)).

Because failure to exhaust is an affirmative defense, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015). Defendants' exhaustion argument pertains only to the First Grievance, Second Grievance, and Third Grievance. *See* Def. Mem. at 5 (arguing for dismissal of claims based only on "Plaintiff's three grievances pertaining to Officer Saeed" attached to the Complaint in *Hosannah I*). Defendants accordingly "cannot meet their burden of establishing the affirmative defense of failure to exhaust in reliance on [the Fourth G]rievance" or Plaintiff's allegations concerning August 12, 2015. *Drew v. City of New York*, No. 16-CV-0594, 2016 WL 4533660, at *7 n.12 (S.D.N.Y. Aug. 29, 2016) (addressing defendants' failure to discuss a particular grievance in their exhaustion arguments).

### a) The Grievance Process

Defendants report the NCCC inmate grievance process "is detailed in the NCCC Inmate Handbook" (the "Handbook"). Def. 56.1 Statement ¶ 7; *see also* ECF No. 70 (reporting that the Handbook, filed at ECF No. 70-3, is attached as Exhibit C to the Declaration of Liora M. Ben-Sorek). "Upon admission to the Correctional Center, all inmates receive a copy of the . . . Handbook."[7] Def. Mem. at 2. The Handbook describes a three-step grievance process.[8] The first step requires the

---

[7] The Court accepts that contention, notwithstanding Defendants' failure to cite supporting factual authority in the record, because Plaintiff has not denied receiving the Handbook and Plaintiff's timely filing of the Grievances demonstrates familiarity with the NCCC's grievance procedures. *See Anderson v. Spizziota*, No. 11-CV-5663, 2016 WL 11480707, at *3 (E.D.N.Y. Feb. 12, 2016) (accepting that plaintiffs received copies of the Handbook upon admission to the NCCC because plaintiffs did not deny receiving them), *report and recommendation adopted sub nom. Anderson v. Sposato*, No. 11-CV-5663, 2016 WL 1275044 (E.D.N.Y. Mar. 31, 2016); *Pooler v. Nassau Univ. Med. Ctr.*, 848 F. Supp. 2d 332, 341 (E.D.N.Y. 2012) (finding Plaintiff's assertion that he was not aware of the grievance policy in the Handbook "is undermined by the fact that he previously filed at least two grievances relating to his medical care").

[8] Prior to the first formal step, an inmate may attempt to resolve the issue informally. *See* ECF No. 70-3 at 4. Such informal efforts toll the grievance timetable. *See id.* ("[T]he time utilized in attempting to resolve the complaint

inmate to submit a grievance form for review by the Grievance Coordinator within five days of the subject occurrence.  *See* ECF No. 70-3 at 4.  The Grievance Coordinator must then issue a "written finding" within five business days of receiving the grievance.  *Id*.  The second step provides an inmate may, within two business days of receiving it, appeal "a negative finding" from the Grievance Coordinator to the Chief Administrative Officer.  *Id*.  The Chief Administrative Officer must then issue a "written determination" within five business days of receiving the appeal.  *Id*. at 5.  The third step provides an inmate may, within three business days of receiving it, appeal the Chief Administrative Officer's decision to "den[y]" the grievance "in whole or in part" to the New York State Commission of Correction.[9]  *Id*.  That final appeal must be decided within forty-five business days of its receipt.  *Id*.

The NCCC's grievance form documents the full grievance process.  Section I allows for the grievant to specify the issue grieved, provide supporting documentation, and state the requested relief. *See* Compl. at 7, 9, 11.  Section II provides the decision of the Grievance Coordinator, which is rendered in part by checking one of three boxes: "Grievance Accepted," "Grievance Denied," or "Non-Grievable Issue."  *Id.*  Section III is entitled "Acceptance/Appeal of Grievance Coordinator's decision," in which the grievant must check one of two boxes—either "I have read and accept the Grievance Coordinator's decision" or "I have read and appeal the Grievance Coordinator's decision"—and sign thereunder.  *Id.*  Section IV provides for the Chief Administrative Officer to rule on any appeal the grievant took (in Section III) regarding the Grievance Coordinator's decision in Section II.  *Id.* at 8, 10, 12.  Finally, Section V advises the grievant of his right to appeal the Chief Administrative Officer's decision and provides a box for the grievant to indicate "My grievance was

---

informally will not be calculated into the grievance timetable.").

[9] Within three business days of receiving it, the NCCC Grievance Coordinator must mail that appeal to the New York State Commission of Correction's Citizens Policy and Complaint Review Council and provide proof of mailing to the inmate.  *See* ECF No. 70-3 at 5.

denied, in whole or in part, and I appeal to the Citizen's Policy and Complaint Review Council . . . ." *Id*. Therefore, "appeals at each level are commenced by the inmate by making selections on the original grievance form." *Anderson*, 2016 WL 11480707, at *7.

> b)   *Plaintiff's Grievances*

Defendants argue that Plaintiff failed to exhaust his administrative remedies because he did not appeal the Grievance coordinator's decisions to "accept" the First Grievance, Second Grievance, and Third Grievance and refer them for investigation.  *See* Def. Mem. at 5.  As noted above, the NCCC's grievance policy allows inmates to appeal only a "negative finding" from the Grievance coordinator. ECF No. 70-3 at 4.  But the Grievance Coordinator did not provide a negative finding for any of those grievances.  On the contrary, the Grievance coordinator's acceptance of those grievances was "a favorable ruling." *Anderson*, 2016 WL 11480707, at *7.

Courts in this district recognize that the NCCC's policy precludes inmates from appealing the Grievance Coordinator' referral of a grievance for investigation, which leaves such grievant inmates without a further administrative remedy to exhaust.  As the court in *Taylor v. Wilde* recently explained:

> A negative decision, such that it would be appealable under the NCCC's rules would have been a denial of grievance, and there was box to indicate such a determination which was not checked on the grievance form.  Instead, the Grievance Coordinator appears to not have made a determination, deciding instead to refer the grievance to a different body, Internal Affairs.  Because a referral is not a "negative determination," the NCCC's rules did not provide a remedy of appeal for a referral decision.  Thus, the appeals process was not "capable of use" to Plaintiff to obtain "some relief for the action complained of."  *See Ross* 578 U.S. at 642.

No. 11-CV-3608, 2022 WL 5429655, at *8 (E.D.N.Y. June 8, 2022), *report and recommendation adopted*, 2022 WL 4536243 (E.D.N.Y. Sept. 28, 2022).  The court in *Guzman v. Sposato* reached the same conclusion where, as here, the NCCC Grievance Coordinator "accepted" the plaintiff's grievance and stated the grievance was "forwarded to the facility's Internal Affairs Unit." No. 13-CV-6829, 2018 WL 1597395, at *4 (E.D.N.Y. Mar. 31, 2018).  That court held that forwarding the

grievance for investigation indicated "that the Grievance Coordinator was powerless to provide plaintiff with any remedy" and concluded "if the officials to whom the grievances are directed do not have the authority to provide any remedy to an inmate when an internal affairs investigation is ongoing, then no administrative remedies are available and exhaustion is not required." *Id.* (citing *Ross*, 578 U.S. at 640-49).

Given that Plaintiff could not appeal the Grievance Coordinator's referral of the subject grievances for investigation, "the question is whether Plaintiff was [ultimately] given a negative determination on his grievance[s], such that he had an available remedy of appeal." *Taylor*, 2022 WL 5429655, at *8. But Defendants "make[] no argument that Plaintiff failed to exhaust his administrative remedies regarding Internal Affairs' determination . . . As such, Plaintiff had no available remedy beyond the initial filing of the grievance . . . ." [10] *Id.*

### 2.    Physical Injury

The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ." 42 U.S.C. § 1997e(e). That provision "is substantive. It specifies a fact—physical injury—that must be shown in order for a prisoner's claim for damages for mental or emotional injury to succeed." *Walker*, 45 F.4th at 615. Lack of physical injury to the Plaintiff "is not an affirmative defense" that Defendants must prove. *Id.* (emphasis removed). Instead, each plaintiff seeking compensatory damages for mental or emotional injuries bears "the

---

[10] Defendants report in a footnote, without citing factual authority in the record, that "[a]n Internal Affairs Unit investigation was conducted (I-061-14)" and concluded at an unspecified time that unspecified portions of "Plaintiff's claims were unfounded." Def. Mem. at 5 n.2. But an argument that Plaintiff failed to exhaust administrative remedies concerning the conclusion of the investigations into the First Grievance, Second Grievance, and Third Grievance, even if made, would fail because Defendants have not indicated how Plaintiff could have exercised those remedies. *See Guzman*, 2018 WL 1597395, at *4 ("[D]efendants have not provided any . . . [evidence] to indicate that administrative remedies are available to an inmate who already has a pending Internal Affairs complaint. As such, defendants have not shown that they are entitled to summary judgment . . . ."); *see also Hubbs*, 788 F.3d at 59 (2d Cir. 2015) ("[D]efendants bear the initial burden of establishing . . . that a grievance process exists and applies to the underlying dispute.").

express statutory obligation to show that he had also suffered physical injury, evidence of which is presumptively accessible to him." *Id*. at 616.

Plaintiff's reported insomnia, nightmares, fear, depression, and "psychological trauma" are not a cognizable "physical injury" under the PLRA.  ECF No. 72 at 3; *see, e.g.*, *Roldan v. Kang*, No. 13-CV-6889, 2016 WL 4625688, at *5 (S.D.N.Y. Sept. 6, 2016) (finding depression is not a "physical injury" under the PLRA); *Antrobus v. City of New York*, No. 11-CV-2524, 2014 WL 1285648, at *6 (S.D.N.Y. Mar. 27, 2014) (finding emotional distress, emotional despair, mental anguish, post-traumatic stress disorder, and paranoia disorder are not "physical injury" under the PLRA).  But that conclusion does not compel dismissal of the Plaintiff's claims.  "Section 1997e(e) does not limit the availability of nominal damages  . . . or of punitive damages." *Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002); *see Walker*, 45 F.4th at 612-13 (similar).  For that reason, courts routinely allow pursuit of nominal and punitive damages after dismissing related prayers for compensatory damages to remedy mental and emotional injuries.[11]  *See Ford v. Aramark*, No. 18-CV-2696, 2020 WL 377882, at *15 (S.D.N.Y. Jan. 23, 2020); *Walker v. City of N.Y.*, 367 F. Supp. 3d 39, 65 (S.D.N.Y. 2019); *Allen v. Keanen*, No. 13-CV-718, 2019 WL 1486679, at *4 (W.D.N.Y. Apr. 4, 2019).

### C.    Plaintiff's Claim For First Amendment Retaliation

To prove his First Amendment retaliation claim, Plaintiff must show three elements: (1) Plaintiff's speech at issue was protected, (2) Saeed took adverse action against Plaintiff, and

---

[11]  Further, relevant to Plaintiff's First Amendment retaliation claim is that the PLRA "does not restrict a plaintiff's ability to recover compensatory damages for actual injury."  *Thompson*, 284 F.3d at 416.  "[A] First Amendment deprivation presents a cognizable injury standing alone and the PLRA 'does not bar a separate award of damages to compensate the plaintiff for the First Amendment violation in and of itself.'"  *Lipton v. Cnty. of Orange, NY*, 315 F. Supp. 2d 434, 457 (S.D.N.Y. 2004) (quoting *Ford v. McGinnis*, 198 F.Supp.2d 363, 366 (S.D.N.Y. 2001); *see Toliver v. City of N.Y.*, 530 F. App'x 90, 93 n.2 (2d Cir. 2013) (holding that the PLRA did not preclude recovering "damages for injuries to [plaintiff's] First Amendment rights" (citing *Thompson*, 284 F.3d at 416)).  In other words, Section 1997e(e) does not affect Plaintiff's entitlement to compensatory damages for "intangible deprivations of liberty and personal rights" from First Amendment retaliation because such damages "are distinct from claims for pain and suffering, mental anguish, and mental trauma."  *Malik v. City of New York*, No. 11-CV-6062, 2012 WL 3345317, at *16 (S.D.N.Y. Aug. 15, 2012), *report and recommendation adopted*, 2012 WL 4475156 (S.D.N.Y. Sept. 28, 2012); *see Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *8 (S.D.N.Y. Feb. 14, 2018) (holding Section 1997e(e) did not bar a First Amendment claim).  This point is academic because, as explained below, Plaintiff's First Amendment claim fails.

(3) there was a causal connection between Plaintiff's protected speech and Saeed's adverse action. *See Hayes*, 976 F.3d at 272; *Espinal*, 558 F.3d at 128.  Defendants' argument that Saeed's verbal threats cannot sustain a Section 1983 cause of action implicates the second element (and by extension, the third element) of the claim.[12]  *See* Def. Mem. at 7.

"To be an 'adverse action,' retaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Hayes*, 976 F.3d at 272 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)).  This "objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004); *see Ford v. Palmer*, 539 F. App'x 5, 6 (2d Cir. 2013) (holding that prisoner who continued to file grievances nonetheless alleged an adverse action sufficient to sustain a First Amendment retaliation claim).  The Court must "bear[] in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse. " *Davis*, 320 F.3d at 353 (internal citations, quotations, and alterations omitted).  In addition, the Court must view the retaliation claim "with skepticism and particular care" given "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

     1.    <u>Retaliatory Verbal Threats</u>

As noted above, Plaintiff alleges that, in response to the First Grievance, Saeed threatened to lock Plaintiff in his unit (unless Plaintiff signed a copy of the First Disciplinary Form) and, in response to the Second Grievance, Saeed threatened to "fuck [Plaintiff] up" (unless Plaintiff returned

---

[12] Plaintiff satisfies the first element. "[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'"  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996)).

his copy of the First Disciplinary Form).  Compl. at 9, 11.  "[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action.  But not all do." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010).  To qualify as "adverse actions" in the prison retaliation context, verbal threats must be both (1) statements that would deter a similarly situated inmate of ordinary firmness from exercising his constitutional rights, *see Hayes*, 976 F.3d at 272, and (2) "sufficiently specific and direct,"  *George v. Cnty. Of Westchester*, No. 20-CV-1723, 2021 WL 4392485, at *7 (S.D.N.Y. Sept. 24, 2021) (internal quotations omitted).  *See also Mateo*, 682 F. Supp. 2d at 434 ("The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.").

That Saeed reportedly responded to the First Grievance by threatening to lock Plaintiff in his unit "is not sufficient adverse action for purposes of a First Amendment retaliation claim." *Sanchez v. Shanley*, No. 20-CV-0648, 2021 WL 365912, at *3 (N.D.N.Y. Feb. 3, 2021) (addressing a threat to place an inmate in "restrictive confinement" for filing a grievance); *see Garcia v. Watts*, No. 08-CV-7778, 2009 WL 2777085, at *11-12 (S.D.N.Y. Sept. 1, 2009) (finding threats to place inmate in the "SHU" for filing grievances was insufficient adverse action).  Similarly, Saeed's reported threat to "fuck up" Plaintiff in response to the Second Grievance is "disgusting, offensive and highly unprofessional conduct [but it] does not rise to the level of a constitutional tort (which is to say, it is not sufficiently serious to deter a person of ordinary firmness from continuing to exercise his First Amendment rights)." *Quezada v. Roy*, No. 14-CV-4056, 2015 WL 5970355, at *22-23 (S.D.N.Y. Oct. 13, 2015) (addressing threats corrections officers made to plaintiff for filing grievances, including threat of "I am going to fuck you up very bad"); *see Bilal v. N.Y. State Dep't of Corr.*, No. 09-CV-8433, 2010 WL 2506988, at *16 (S.D.N.Y. June 21, 2010) (finding threat that correction officers "usually fuck people up for writing a bunch of bullshit grievances" was insufficiently direct or specific), *aff'd sub nom. Bilal v. White*, 494 F. App'x 143 (2d Cir. 2012).

    2.    <u>Retaliatory Exclusion From The NCCC Law Library</u>

The Second Grievance could be read to allege that Saeed excluded Plaintiff from the NCCC law library on March 28, 2014 as retaliation for filing the First Grievance. *See* Compl. at 9 ("On 3-28-14 I refused the law library and was given [the First Disciplinary Form] by Officer Saeed . . . Staff are prohibited against retaliating against inmate for grieving an officer for his misconduct."). But Plaintiff clarified at his deposition that, upon seeing Saeed that day, Plaintiff chose to not go to the law library. *See* Plaintiff Dep. Tr. at 115:8-17 ("This is actually the time when I refused to go to the law library, because . . . I came out the unit and I saw [Saeed] and I was like, 'Oh, I am not going.' I refused . . . ."). In any event, a claim that Saeed once excluded Plaintiff from the law library could not sustain a First Amendment retaliation claim on this record.[13] *See Corines v. Westchester Cnty. Dep't of Correction*, No. 22-CV-5179, 2022 WL 4341999, at *5 (S.D.N.Y. Sept. 19, 2022) ("Plaintiff makes no allegation, for example, that the timing of his law library access had any consequences for his legal matters. Plaintiff's allegations thus do not show that he was subjected to an adverse action.").

**D.    The Fourteenth Amendment Claim**

As explained above, Plaintiff asserted a claim under the Eighth Amendment's prohibition against cruel and unusual punishment with respect to his time as a pretrial detainee at the NCCC—but "[t]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." *Revere*, 463 U.S. at 244. The Due Process Clause of the Fourteenth Amendment, however, applies to pretrial detainees and generally provides protections that are "at least as great as the Eighth Amendment protections available to a convicted prisoner."[14] *Darnell*, 849 F.3d at 29 (quoting *Revere*, 463 U.S. at

---

[13] Plaintiff's assertion in opposition to the instant motion that he "would often be denied law library access" does not compel a contrary conclusion. ECF No. 72 at 3. That allegation is overly generic. *See Corines*, 2022 WL 4341999, at *5 (dismissing claim alleging retaliatory exclusion from the law library as too generic).

[14] The Fourteenth Amendment provides, in relevant part, that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life,

244). With this in mind, the Court will review the remainder of Plaintiff's claims under the Fourteenth Amendment.

1.     Sexual Harassment

As discussed above, Plaintiff has alleged that Hosannah sexually harassed him on at least two occasions. *See* Compl. at 7 (reporting in the First Grievance that on January 30, 2014 Saeed commented that Plaintiff looked "big and strong"); *Hosannah II*, ECF No. 1 at 10 (reporting in the Fourth Grievance that on July 1, 2015 Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff). But "allegations that a correction officer threatened sexual assault or harassed an inmate, but did not initiate physical contact, fail to state a cognizable claim under section 1983." *Camacho v. Potter*, No. 21-CV-6180, 2021 WL 3501161, at *4 (S.D.N.Y. Aug. 9, 2021) (dismissing claim that corrections officer "grabbed his groin area while telling plaintiff, 'You ain't seen nothing yet;'" collecting cases); *see Burroughs v. Petrone*, 138 F. Supp. 3d 182, 198, 205 (N.D.N.Y. 2015) (concluding, where a corrections officer allegedly made "verbal sexual advancements" and "masturbated in plaintiff's presence," that "the alleged conduct is certainly distasteful [but] . . . mere allegations of verbal harassment are insufficient to support a § 1983 claim"); *Jones v. Rock*, No. 12-CV-0447, 2013 WL 4804500, at *19 (N.D.N.Y. Sept. 6, 2013) (dismissing claim that corrections officer threatened to "take care of" plaintiff's "virginity" because "the law is clear that 'although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983'" (quoting *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997)).

2.     Verbal Threats

The Second Grievance and Third Grievance concern verbal threats of a non-sexual nature. *See* Compl. at 9 (reporting Saeed threatened to lock Plaintiff in his cell); *id*. at 11 (reporting Saeed

---

liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV.

threatened to "fuck [Plaintiff] up").  "It is well-settled that pre-trial detainees do not have cognizable § 1983 claims based on allegations of verbal harassment and/or abuse." *Carzoglio v. Abrams*, No. 18-CV-4198, 2020 WL 905630, at *5 (S.D.N.Y. Feb. 25, 2020) (collecting cases; dismissing allegation that defendant threatened to give plaintiff a "fatal dose" of his medication); s*ee Williams v. Ramos*, No. 13-CV-826, 2013 WL 7017674, at *6 (S.D.N.Y. Dec. 23, 2013) (dismissing pretrial detainee's claim that corrections officer threated to "fuck[ him] up"); *see also Henrius v. Cnty. of Nassau*, No. 13-CV-1192, 2015 WL 5542464, at *16 n.7 (E.D.N.Y. Sept. 16, 2015) (finding pretrial detainee's allegations "even if rising to the level of verbal harassment, do not state a claim for a constitutional violation").

Plaintiff's assertions in opposition to the instant motion that he suffered from "insomnia, nightmares, and an overall fear of Officer Saeed" as well as "psychological injury, psychological trauma, and depression" due to Saeed's threats do not make those threats actionable.  ECF No. 72 at 3. Taking those assertions as true—without regard to Plaintiff's representation in the Compliant that he suffered "no injury," Compl. at 4—"those symptoms were merely the physical manifestations of emotional distress caused by two statements that, as discussed above, were objectively unoffensive to the Constitution."[15] *Byrd v. City of New York*, No. 17-CV-2166, 2018 WL 259316, at *6 (S.D.N.Y. Jan. 2, 2018) (dismissing claim that threats spiked pretrial detainee's blood pressure, escalated his heart rate, and caused dizziness, sweats, and chest pains); *see Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (dismissing pretrial detainee's claim that threat from corrections officer caused him to fear for his life); *Barnes v. Cnty. of Monroe*, 85 F. Supp. 3d 696, 739 (W.D.N.Y. 2015) (dismissing pretrial detainee's claim regarding threat from jail personnel even though it reportedly caused him to "violently 'shake uncontrollably'").

---

[15] The Court explained above that those statements failed to constitute "adverse action" under the lower standard applicable to Plaintiff's First Amendment retaliation claim.

3.    Sexual Abuse

As noted above, Plaintiff has also alleged two instances of Saeed physically touching Plaintiff while sexually harassing him.  Plaintiff asserts that (1) on January 30, 2014, Saeed "gentley [sic] squeez[ed]" Plaintiff's shoulder while commenting on Plaintiff's appearance, and (2) on August 12, 2015, Saeed took over an in-progress escort of Plaintiff and undertook a frisk search—over the protests of the already-present officer, who also confirmed that Plaintiff had just been searched—in which he squeezed Plaintiff's buttocks, grabbed Plaintiff's genitals, held them "for a few seconds," again squeezed Plaintiff's buttocks, and threatened he would come to Plaintiff's unit if Plaintiff "said anything."  Compl. at 7; ECF No. 72 at 11-12; *Hosannah II*, ECF No. 1 at 4.  The nature of that contact and its concurrence with reported sexual harassment necessitates analysis as sexual abuse. Under the Eighth Amendment, a convicted prisoner must show both a subjective and an objective element: (1) "that the defendant acted with a subjectively 'sufficiently culpable state of mind,'" and (2) "that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8, 20 (1992)).  Under the objective prong, the conduct must be "incompatible with evolving standards of decency or involve the unnecessary and wanton infliction of pain."[16] *Id*. at 256 (internal quotations omitted).

---

[16] Prior to 2015, *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997) was the leading Second Circuit case on Eighth Amendment sexual abuse claims.  *See Crawford*, 796 F.3d at 257 ("*Boddie* made clear that 'severe or repetitive sexual abuse of an inmate by a prison officer can be objectively, sufficiently serious enough to constitute an Eighth Amendment violation'" (quoting *Boddie*, 105 F.3d at 861)).  In *Boddie*, the Court held that the plaintiff failed to state an Eighth Amendment claim after a female corrections officer made "a pass" at an him, squeezed his hand, touched his penis, called him a "sexy black devil," and pressed into him "with her whole body vagina against penis" because no single incident was sufficiently serious and the series of incidents were not "cumulatively egregious" enough to reach constitutional dimensions.  *Boddie*, 105 F.3d at 859-61.  However, the Second Circuit decided *Crawford* in 2015 and held that "while the standard articulated in *Boddie* remains the same, its applicability must change as the basic mores of society change." 796 F.3d at 260 (internal quotations omitted).  Accordingly, the Court in *Crawford* concluded "conduct that might not have been seen to rise to the severity of an Eighth Amendment violation 18 years ago may now violate community standards of decency, and for that reason, we believe that the officers' conduct in *Boddie* would flunk its own test today." *Id.*

Courts have acknowledged that it "is presently unclear" whether the standard for a pretrial detainee's sexual abuse claim under the Fourteenth Amendment is identical to the standard for a convicted inmate's sexual abuse claim under the Eighth Amendment. *Lewis v. Huebner*, No. 17-CV-8101, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020); *see Johnson v. Cook*, No. 19-CV-1464, 2021 WL 2741723, at *11 (D. Conn. July 1, 2021) (explaining that the overlap between the standards "is not yet clear"). In addressing a pretrial detainee's excessive force (not sexual abuse) claim under the Fourteenth Amendment, the Supreme Court held that a detainee is required to show only that "the force purposely and knowingly used was objectively unreasonable in light of the facts and circumstances at the time." *Kingsley v. Hendrickson*, 576 U.S. 389, 397-98 (2015); *see id*. at 397 (confirming that test "is solely an objective one"). "Since *Kingsley*, courts in this Circuit have noted that it is not yet clear whether a pretrial detainee bringing a sexual abuse claim under the Fourteenth Amendment—as opposed to an excessive force claim—must satisfy both prongs" of the Eighth Amendment sexual abuse test or only the objective prong. *Johnson*, 2021 WL 2741723, at *11 (collecting cases). The Court, however, may address Plaintiff's sexual abuse claims in the context of the instant motion for summary judgment without resolving this uncertainty. *See id*. (adopting the same approach).

### a) *Saeed's Physical Contact With Plaintiff's Shoulder*

Saeed's contact with Plaintiff's shoulder on January 30, 2014 cannot sustain a sexual abuse claim because that minimal contact was not objectively harmful or serious enough to violate the constitution. *See Silvagnoli v. Fischer*, No. 07-CV-561, 2010 WL 1063849, at *14 (N.D.N.Y. Mar. 1, 2010) (recommending dismissal of claim that corrections officer massaged plaintiff's shoulders and attempted to grab his groin because that conduct was not objectively harmful or serious enough to constitute sexual abuse), *report and recommendation adopted*, 2010 WL 1063840 (N.D.N.Y. Mar. 22,

2010);[17] *Roberts v. Hernandez*, No. 11-cv-03308, 2014 WL 4976309, at *12 (E.D. Cal. Sept. 30, 2014) (dismissing claim that corrections officer placed his hand on plaintiff's shoulder while sexually harassing plaintiff because the "statements to plaintiff and brief touch were not objectively harmful enough to establish a constitutional violation . . . ." (internal quotations omitted)).

> b)    *Saheed's Physical Squeezing of Plaintiff's Genitals And Buttocks, And Threat To Dissuade Reporting Same*

Summary judgment on the excessive force claim arising from Saeed's August 12, 2015 physical contact with Plaintiff's buttocks and genitals, however, would be inappropriate because Defendants' "submissions in support of summary judgment do not address or discuss this particular claim." *Tatum v. City of New York*, No. 06-CV-4290, 2009 WL 124881, at *10 (S.D.N.Y. Jan. 20, 2009) ("In the absence of any stated basis for dismissal, the Court will not dismiss this claim *sua sponte.*"); *see White v. Hess*, No. 14-CV-03339, 2020 WL 1536379, at *8 (E.D.N.Y. Mar. 31, 2020) (declining to dismiss deliberate indifference and excessive force claims because they were not addressed in defendants' motion for summary judgment); *Struthers v. City of New York*, No. 12-CV-242, 2013 WL 2390721, at *16 (E.D.N.Y. May 31, 2013) (declining to dismiss an unlawful search claim because defendants' motion for summary judgment did not address the underlying search).

Nor is the Court required to dismiss those allegations for failure to state a claim. *See* 42 U.S.C. § 1997e(c) (requiring the Court to dismiss a Section 1983 prisoner action that fails to state a claim); 28 U.S.C. § 1915(e)(2)(B)(ii) (requiring the Court to dismiss an action proceeding *in forma pauperis* that fails to state a claim). It bears repeating that Plaintiff alleged Saeed—who was already the subject of sexual harassment allegations in the First and Fourth Grievances—overtook an in-

---

[17] The Second Circuit abrogated a portion of *Silvagnoli* concerning the Americans With Disabilities Act, but Courts in this district continue to rely on the *Silvagnoli's* analysis of the Section 1983 claims. *Compare Widomski v. State Univ. of New York (SUNY) at Orange*, 748 F.3d 471, 475 (2d Cir. 2014) (rejecting how *Silvagnoli* and other cases applied the term "disability" under the ADA) *with Casiano v. Cnty. of Nassau*, No. 16-CV-1194S, 2017 WL 4484338, at *4 (E.D.N.Y. Sept. 30, 2017) (citing *Silvagnoli* in dismissing Plaintiff's Eighth Amendment claim against a prison superintendent).

progress escort of Plaintiff, did so over the objection of the then-presiding escort, and initiated a frisk search in which he grabbed Plaintiff's buttocks, grabbed Plaintiff's genitals and held them for "a few seconds," returned to grab Plaintiff's buttocks a second time, and threatened to go to Plaintiff's unit if he said "anything" about the encounter. *Hosannah II*, ECF No. 1 at 20. As pled by *pro se* Plaintiff, the nature of Saeed's contact with Plaintiff's genitals and buttocks, its timing (interrupting another officer's escort of Plaintiff), and Saeed's threat apparently intended to dissuade Plaintiff from reporting that contact collectively meet the objective element of a sexual abuse claim.[18] *See Crawford*, 796 F.3d at 258 (finding allegation that officer "squeezed" and "fondled" plaintiff's penis during a frisk search to determine whether plaintiff had an erection was actionable because "no amount of gratuitous or sexually-motivated fondling of an inmate's genitals—even if limited in duration or conducted through the inmate's clothes . . . —is permitted by the Constitution"); *see id*. (explaining that the timing of the search suggested it was a pretext for sexual abuse); *Shepherd v. Fisher*, No. 08-CV-9297, 2017 WL 666213, at *18 (S.D.N.Y. Feb. 16, 2017) (declining to dismiss sexual abuse claim where defendant "squeez[ed] and fondl[ed]" plaintiff's genitals during a frisk search and threatened to retaliate if plaintiff reported it). To the extent it applies to a pretrial detainee's claim under the Fourteenth Amendment, the subjective element of the sexual abuse standard is satisfied by Saeed's contemporaneous threat to find plaintiff if he reported the contact. *See Crawford*, 796 F.3d at 259 (finding the defendant's statements after he fondled plaintiff's penis indicated that he initiated physical contact with a culpable state of mind); *Shepherd*, 2017 WL 666213, at *18 (finding defendant's threat to retaliate if plaintiff said "anything" about a frisk search indicated that search was undertaken for "sexual gratification, to humiliate Shepherd, or both."). To

---

[18] Saeed's threat is relevant to the objective analysis because "[w]hen evaluating the objective prong, courts holistically consider the nature of a defendant's conduct—they do not divorce the physical and verbal components of the conduct." *DeJesus v. Malloy*, 531 F. Supp. 3d 650, 665 (W.D.N.Y. 2021) (quoting *Shepherd v. Fischer*, No. 08-CV-9297, 2018 WL 3122053, at *4 (S.D.N.Y. June 26, 2018)), *reconsideration denied*, 582 F. Supp. 3d 82 (W.D.N.Y. 2022).

be clear, even if Saeed initially had a proper justification to undertake the search, "that justification would not immunize subsequent conduct that exceeded constitutional bounds." *Shepherd*, 2017 WL 666213, at \*18.

### E.    Municipal Liability

A claim for municipal liability under Section 1983 must comply with *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny. "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Frost v. New York City Police Dep't*, 980 F.3d 231, 257 (2d Cir. 2020) (quoting *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006)). Thus, "[t]o establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Id*. (internal quotations omitted). A policy or custom may be established by any of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular constitutional deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Alwan v. City of New York*, 311 F. Supp. 3d 570, 578 (E.D.N.Y. 2018) (internal quotations omitted); *see Ying Li v. City of New York*, 246 F. Supp. 3d 578, 636 (E.D.N.Y. 2017) (similar). Plaintiff's allegations could be construed to pursue the third and fourth above-listed methods of pursuing a *Monell* claim against Nassau County. *See McLeod*, 864 F.3d at 156 (stating that courts must read *pro se* filings "to raise the strongest arguments they suggest" (internal quotations omitted)).

1.    Persistent And Widespread Practice

"In order to establish *Monell* liability based upon a 'persistent and widespread' practice by a subordinate municipal employee (or employees) other than a policymaker, the employee's unconstitutional conduct must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297-98 (2d Cir. 2020) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).  "In other words, there must be 'sufficient instances of tolerant awareness by supervisors of abusive conduct to support an inference that they had a policy, custom or usage of acquiescence in such abuse.'" *Id*. (quoting *Jones v. Town of E. Haven*, 691 F.3d 72, 82 (2d Cir. 2012)).  As explained above, the only viable constitutional violation Plaintiff alleges pertains to Saeed's August 12, 2015 contact with Plaintiff.  That does not amount to a persistent and widespread practice or custom.  *See, e.g., Giaccio v. City of New York*, 308 F. App'x 470, 472 (2d Cir. 2009) (affirming summary judgment dismissing *Monell* claim where plaintiff "identifie[d], at most, only four examples" of constitutional violations because "[t]his evidence falls far short of establishing a practice that is so 'persistent or widespread' as to justify the imposition of municipal liability" (citation and internal quotations omitted)).

2.    Failure To Supervise

A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the [municipal] employees interact." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)); *see Montero v. City of Yonkers, New York*, 890 F.3d 386, 403 (2d Cir. 2018) (holding that a failure to supervise claim applies where a "policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions" (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)).  Put differently, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused

by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a [municipal] policy or custom that is actionable under § 1983.'" *Amnesty Am.*, 361 F.3d at 126 (quoting *City of Canton*, 489 U.S. at 388).

To establish the requisite "deliberate indifference," Plaintiff must "show[] that 'the need for more or better supervision to protect against constitutional violations was obvious'" and that a policymaker "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct." *Id.* at 127 (quoting *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995)). Therefore, "[a] plaintiff alleging a municipality's deliberate indifference on a failure to supervise theory must cite violations that occurred before the conduct at issue took place." *Rodriguez v. City of N.Y.*, No. 21-CV-1649, 2022 WL 17750094, at *9 (E.D.N.Y. June 7, 2022); *see Greene v. City of New York*, 742 F. App'x 532, 537 (2d Cir. 2018) (holding that a plaintiff cannot rely on subordinate municipal employees' "contemporaneous or subsequent" constitutional violations as evidence that a policy maker was aware of the need to modify the municipality's supervisory structure (internal quotations omitted)).

Plaintiff, however, has not pled that Saeed's potential to commit sexual abuse was "obvious" to anyone, let alone any policymaker, before August 12, 2015 such that a policymaker should have "prevent[ed]" Saeed's interaction with Plaintiff on that date.[19] *Amnesty Am.*, 361 F.3d at 126 (internal quotations omitted); *see McLennon v. City of New York*, 171 F. Supp. 3d 69, 99 (E.D.N.Y. 2016)

---

[19] The First and Fourth Grievances (the only grievances that address sexual conduct) are of no help to Plaintiff in this regard because their allegations fall far from making it "obvious" that Saeed would commit sexual abuse. *See* Compl. at 7 (reporting in the First Grievance that on January 30, 2014 Saeed gently squeezed Plaintiff's shoulder and commented that Plaintiff looked "big and strong"); *Hosannah II*, ECF No. 1 at 10 (reporting in the Fourth Grievance that on July 1, 2015 Saeed told Plaintiff to "take [his] sexy ass" to the front of the law library line and made a kissing "gesture" towards Plaintiff). The affidavits submitted with Plaintiff's opposition to the instant motion likewise do not support a conclusion that a policymaker was aware of the potential for Saeed to commit sexual abuse. *See* ECF No. 72 at 6-8 (affidavit from Jerome Harris describing unreported sexual harassment Saeed perpetuated on the affiant on an unspecified date); *id.* at 9 (affidavit from John Hayes describing one incident of sexual harassment Saeed perpetrated on the affiant on an unspecified date, which was reported to an unidentified "area corporal"); *id.* at 10 (affidavit from Reginald Tucker stating that "[o]n various dates and time[s]" he witnessed Saeed "verbally harass" Plaintiff); *see also Barnes v. Ross*, No. 12-CV-1916, 2014 WL 1329128, at *1 (S.D.N.Y. Apr. 3, 2014) (granting summary judgment where *pro se* plaintiff submitted inmate affidavits "that contain vague or irrelevant assertions").

30

(dismissing failure to supervise *Monell* claim concerning the unlawful arrest of one plaintiff because policymakers had no prior reason to know about the relevant alleged unlawful arrest practices); *Lewis v. Meloni*, 949 F. Supp. 158, 164 n.5 (W.D.N.Y. 1996) (dismissing failure to supervise *Monell* claim for failure to show that "Sheriff Meloni had *prior* knowledge of VanThof's alleged propensity to engage in illegal arrests").

*       *       *

Accordingly, Plaintiff does not allege any unconstitutional policy or custom attributable to Nassau County that would confer municipal liability. *See Haddock*, 2021 WL 5920035, at *2 (construing complaint as asserting municipal liability claim and dismissing same).

## V.    CONCLUSION

For the reasons set forth above, the undersigned recommends that, pursuant to 42 U.S.C. § 1997e(c) and 28 U.S.C. § 1915(e)(2)(B)(ii), the Court DISMISS Plaintiff's claims under the Fifth, Eighth, and Ninth Amendments for failure to state a claim. The undersigned further recommends that the Court GRANT IN PART and DENY IN PART Defendants' summary judgment motion by (1) dismissing the Sheriff's Department from this action; (2) dismissing Plaintiff's claims under the First Amendment, (3) permitting Plaintiff to maintain his claim against Saeed under the Fourteenth Amendment for sexual abuse based on Saeed's alleged August 12, 2015 contact with Plaintiff; and (4) dismissing Plaintiff's other claims under the Fourteenth Amendment. Finally, the undersigned recommends that the Court limit Plaintiff to seeking only nominal and punitive damages for his surviving sexual abuse claim.

Defense counsel is directed to serve a copy of this Report And Recommendation upon Plaintiff and file proof of service by December 30, 2022.

## VI.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Brown.  FAILURE TO FILE TIMELY OBJECTIONS SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS.  *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).

**SO ORDERED:**

Dated:  Central Islip, New York
          December 28, 2022

s/ Lee G. Dunst
_____

**LEE G. DUNST**
United States Magistrate Judge